# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------------------x

**DEBRA LEE KRAUS,**

           **Plaintiff,**

    **v.**

**BEIERSDORF INC. aka**
**BEIERSDORF NORTH AMERICA INC.;**
**BEIERSDORF AG;**
**MAXINGVEST AG formerly**
**TCHIBO HOLDING AG;**
**PETER J. GLEASON,** individually and
in his official capacity as
Manager of IT Support /Operations for Beiersdorf Inc.;
**IAIN R. HOLDING,** individually and
in his official capacity as
President of Beiersdorf Inc.;
**JASON R. PHILLIPS,** individually and
in his official capacity as
VP of IT for Beiersdorf Inc.;
**STEPHEN LEE SHULL,** individually and
in his official capacity as
Manager of IT Business Applications for Beiersdorf Inc.;
**KATHY N. WILLIAMS,** individually and
in her official capacity as
Manager of Human Resources for Beiersdorf Inc.;
**AMY A. R. NENNER,** individually and
in her official capacity as
VP of Human Resources for Beiersdorf Inc.;
**KIMBERLY A. WILCOX,** individually and
in her official capacity as
Human Resources Assistant for Beiersdorf Inc.;
**LISA E. HIOTT,** individually and
in her official capacity as
Director of Human Resources for Beiersdorf Inc.;
**CHRISTINE M. HOQUE,** individually and
in her official capacity as
Manager of Human Resources for Beiersdorf Inc.;
**DR. ERNST GADERMANN,** individually and
in his official capacity as
Department Head of Information Technology (IT)
worldwide for Beiersdorf AG;
**MARKUS PINGER,** individually and
in his official capacity as
the Head of Supply Chain of Beiersdorf AG and
Member of the Executive Board of Beiersdorf AG;
**THOMAS-BERND QUAAS,** individually and
in his official capacity as
the Chief Executive Officer of Beiersdorf AG and
the Chairman of the Executive Board of Beiersdorf AG;

**SECOND AMENDED**
**C O M P L A I N T**

**PLAINTIFF DEMANDS**
**TRIAL BY JURY**

**No.: 3:09−cv−01697 (MRK)**

FILED 2010 APR 14 A 11: 34
U.S. DISTRICT COURT
NEW HAVEN, CT

**March 31, 2010**

**DR. MARKUS CONRAD**, individually and                               :
in his official capacity as                                           :
the Executive Board Chairman and                                      :
Chief Executive Officer of Tchibo GmbH                                :
and as a Member of the Supervisory Board of                           :
Maxingvest AG, also known as Tchibo Holding AG;                       :
**DR. ARNO MAHLERT**, individually and                                :
in his official capacity as                                           :
the Chairman and                                                      :
Chief Executive Officer of Maxingvest AG                              :
and as a Member of the Executive Board of                             :
Maxingvest AG (Formerly, Tchibo Holding AG);                          :
**PROFESSOR DR. REINHARD PÖLLATH,**                                   :
individually and in his official capacity as                          :
the Deputy Chairman  and Member of                                    :
the Supervisory Board of Beiersdorf AG                                :
and as the Chairman of Supervisory Board                              :
of Maxingvest AG;                                                     :
**PETER KLEINSCHMIDT,**                                               :
individually and in his official capacity as                          :
Member of the Executive Board, Human Resources,                       :
and Labor Director at Beiersdorf AG;                                  :
**MICHAEL HERZ,**                                                     :
individually and in his official capacity as                          :
a member of the Supervisory Board of                                  :
Maxingvest AG and Tchibo GmbH;                                        :
**WOLFGANG HERZ,**                                                    :
individually and in his official capacity as                          :
a member of the Supervisory Board of                                  :
Maxingvest AG;                                                        :
                                                                      :
                  Defendants.                                         :
-------------------------------------------------------------------x

Plaintiff Debra Lee Kraus ("Kraus" or "Plaintiff") brings this action *pro se*, complaining of Defendants Beiersdorf Inc. ("BDF"); Beiersdorf AG ("BAG"); Maxingvest AG ("MAG"); Peter J. Gleason ("Gleason"), individually and in his official capacity; Iain R. Holding ("Holding"), individually and in his official capacity; Jason R. Phillips ("Phillips"), individually and in his official capacity; Stephen Lee Shull ("Shull"), individually and in his official capacity; Kathy N. Williams ("Williams"), individually and in her official capacity; Amy A. R. Nenner ("Nenner"), individually and in her official capacity; Kimberly A. Wilcox ("Wilcox"), individually and in her official capacity; Lisa E. Hiott (Hiott"), individually and in her official capacity; Christine M. Hoque ("Hoque"), individually and in her official capacity; Dr. Ernst Gadermann ("Gadermann"), individually and in his official capacity;   Markus Pinger ("Pinger"), individually and in his official capacity; Thomas-Bernd Quaas ("Quaas"), individually and in his official capacity; Dr. Markus Conrad ("Conrad"), individually and in his official capacity; Dr. Arno Mahlert ("Mahlert"), individually and in his official capacity and Professor Dr. Reinhard Pöllath ("Pöllath") individually and in his official capacity; Peter Kleinschmidt ("Kleinschmidt"), individually and in his official capacity; Michael Herz ("MHerz"), individually and in his official capacity; Wolfgang Herz ("WHerz"), individually and in his official capacity, and upon knowledge as to herself and her own acts, and otherwise upon information and belief, she alleges as follows:

## NATURE OF THE ACTION

1. This action is brought to remedy discrimination and harassment based upon sex, national origin, physical disability, age, gender, marital status and pregnancy in the terms and conditions of employment, hostile work environment, retaliation, wrongful termination, and for opposition to unlawful practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634, ("ADEA"); the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.*, 42 U.S.C. § 12203 ("ADA"); the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA"); the Connecticut General Statutes ("CGS") §§46a-60(a)(1), 46a-60(a)(4), 31-75, and Connecticut General Statutes Annotated ("CGSA") §31-51pp.

2. Defendants' actions were unlawful and Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, attorneys' fees, and other appropriate legal and equitable relief pursuant to Title VII, the ADEA, the ADA, the ERISA, CGS, and the CGSA, and such other and further relief as the Court deems necessary and proper.

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f)(1), 42 U.S.C. §2000e-5(f)(3); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634, ("ADEA") and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* ("ADA"); the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132(e)(1), 29 U.S.C. §1132(f).  This Court additionally has supplementary jurisdiction over Plaintiff's claims under the CGS and CGSA pursuant to 28 U.S.C. §1367.

4. Venue for this action in the District of Connecticut under 28 U.S.C. §1391 is appropriate as Defendants' principal place of business is located within the district of this Court, and the district wherein the discriminatory acts occurred.

## JURISDICTIONAL PREREQUISITES

5. Plaintiff filed a timely charge of employment discrimination, harassment and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC") against Defendants on or about February 7, 2008, complaining of discrimination, harassment and retaliation based upon sex and/or gender, and age as alleged herein.

6. The EEOC issued the Plaintiff a Notice of Right to Sue (Issued on Request), dated July 27, 2009.  A copy of Plaintiff's original copy of the Notice of Right to Sue is annexed hereto as "Exhibit A."

7. The EEOC issued the Plaintiff a corrected copy of the Notice of Right to Sue (Issued on Request), dated July 27, 2009 to include the Age Discrimination in Employment Act ("ADEA").  A copy of the corrected copy of the Notice of Right to Sue is annexed hereto as "Exhibit B."

8. This complaint was timely filed within ninety (90) days of receipt of the Notice of Right to Sue.

9. Plaintiff also filed three timely charges of retaliation against Defendants with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC") complaining of repeated acts of retaliation based upon the Plaintiff reporting/complaining (both internally and externally) of past and present acts of discrimination, harassment and retaliation.

10. The EEOC issued Plaintiff three Notice of Right to Sue (Issued on Request) letters, dated October 30, 2009. A copy of Plaintiff's three Notice of Right to Sue (Issued on Request) letters is annexed hereto as "Exhibit C."

11. The additional three complaints were timely filed within ninety (90) days of receipt of the Notice of Right to Sue.

12. Plaintiff has complied fully with all administrative prerequisites of Title VII and with all prerequisites to jurisdiction in this Court.

## PARTIES

13. Plaintiff is a Caucasian single female, and at all times relevant to this complaint, a resident of New Haven County in the State of Connecticut; whose address is P.O. Box 192, Greens Farms, CT 06838-0192.

14. Defendant Beiersdorf ("BDF") is an international branded goods company that manufactures health and beauty products under such brands as NIVEA, Aquaphor, and Eucerin.

15. Defendant BDF is a wholly owned subsidiary of BAG. BDF, the US affiliate, is duly organized and existing under the laws of the State of Delaware, with a place of business BDF Inc. located at 360 Dr. Martin Luther King Drive in Norwalk Connecticut; whose headquarters Beiersdorf North America Inc. is located at 187 Danbury Road, Wilton, Connecticut 06897. BDF is also known as Beiersdorf North America Inc.

16. Defendant BAG is a multinational corporation based in Hamburg, Germany. BAG is the parent company of BDF. Beiersdorf AG is controlled by Tchibo Holding AG. Tchibo Holding is held by members of the Herz family. Beiersdorf AG is incorporated under the laws of Germany and is located at Unnastraße 48 D-20245 Hamburg, Germany.

17. Defendant MAG is the parent company of BAG and BDF. MAG is based in Hamburg, Germany. Tchibo Holding AG's Annual General Meeting held on July 5, 2007 resolved to change the company's name to "maxingvest ag" and that the new name was entered in the commercial register on September 12, 2007. maxingvest ag holds 56 % of the outstanding shares in Beiersdorf AG. maxingvest AG is located at Überseering 18   22297 Hamburg, Germany.

18. At all times relevant to this action from April 2004, Defendant Gleason held a supervisory and/or managerial position (Manager of IT Support /Operations) over the Plaintiff during the course of her employment with Defendants. Upon information and belief, Gleason was recently promoted to and is presently Director of IT Support /Operations. Defendant Peter J. Gleason resides at 54 Shell Avenue, Milford, CT 06460-6351.

19. At all times relevant to this action from September 2006, Defendant Holding was transferred to the United States and was appointed to the position of President of BDF USA, after working for Beiersdorf affiliates in Germany, Belgium, Canada and the Netherlands, and held a supervisory and/or managerial position over the Plaintiff during the course of her employment with Defendants. Defendant Iain R. Holding resides at 7 Cayuga Trail, Harrison, NY 10528-1819 and is also known to have an address at 9 Shelley Lane, West Harrison, NY 10604-1133.

20. At all times relevant to this action from February 2003, Defendant Phillips was initially hired as a contract consultant and later offered the full-time position of VP of IT for BDF until he resigned in July 2007. Phillips held a managerial position over the Plaintiff during her employment with Defendants. Defendant Jason R. Phillips resides at 18120 Ironstone Way, Lakeville, MN 55044-5014.

21. At all times relevant to this action from August 2005, Defendant Shull held a managerial position; Manager of IT Business Applications, over the Plaintiff during her employment with Defendants. Defendant Stephen L. Shull resides at 20 Charter Ridge Drive, Sandy Hook, CT 06482-1581.

22. At all times relevant to this action, Defendant Williams was employed by BDF as Manager of Human Resources. Upon information and belief, Williams was recently promoted to and is presently the Director of Human Resources. Defendant Kathy N. Williams resides at 11 Norden Pl, Unit A 13, Norwalk, CT 06855-1446.

23. Since January 21, 2008, Defendant Nenner has been employed by BDF as VP of Human Resources. Defendant Amy A. R. Nenner resides at 8 Lockwood Circle, Westport, CT 06880 and is also known to have an address at 555 Heritage Hills Apt, Somers, NY 10589-1958.

24. At all times relevant to this action, Defendant Wilcox was employed by BDF as a Human Resources Assistant. Defendant Kimberly A. Wilcox resides at 5 Maxwell Road, Norwalk, CT 06851-5205.

25. At all times relevant to this action, Defendant Hiott was employed by BDF Inc. as Director of Human Resources until her resignation in 2008. Defendant Lisa E. Hiott resides at 1193 Hope Street APT 5, Stamford, CT 06907-1634.

26. At all times relevant to this action, Defendant Hoque was employed by BDF Inc. as Manager of Human Resources until her resignation in 2008. Defendant Christine M. Hoque resides at 32 Mill Brook Road #38, Stamford, CT 06902-1018.

27. At all times relevant to this action, Defendant Gadermann was employed by BAG in Hamburg, Germany as Department Head of Information Technology (IT) worldwide.

28. At all times relevant to this action, Defendant Pinger was employed by BAG in Hamburg, Germany as the Head of Supply Chain of BAG and a Member of the Executive Board of BAG.

29. At all times relevant to this action, Defendant Quaas was employed at BAG in Hamburg, Germany as the Chief Executive Officer of BAG and Head of Medical Division. Quaas is the Chairman of the Executive Board of BAG and has been since May 18, 2005. In this position, Quaas is responsible for supply chain management, which covers worldwide purchasing, production and logistics.

30. At all times relevant to this action, Defendant Conrad was employed at Tchibo GmbH in Hamburg, Germany as the Executive Board Chairman and Chief Executive Officer of Tchibo GmbH. He is a Member of the Supervisory Board of Maxingvest AG, also known as Tchibo Holding AG.

31. At all times relevant to this action, Defendant Mahlert is employed by Maxingvest AG in Hamburg, Germany as the Chairman and Chief Executive Officer of Maxingvest AG and serves as its Chief Financial Officer. Mahlert is a Member of the Executive Board of Maxingvest AG (Formerly, Tchibo Holding AG). He has been the Chief Financial Officer of Tchibo Holding AG since June 2004. He is the Finance Director of Maxingvest AG. He is also a Member of the Supervisory Board of Tchibo GmbH and has been since May 2004. Mahlert has also been a Member of the Supervisory Board of BAG since June 2004.

32. At all times relevant to this action, Defendant Prof. Dr. Reinhard Pöllath is located in Munich, Germany. He is the Deputy Chairman of Supervisory Board of Beiersdorf AG since June 2004. Mr. Pöllath is a Member of the Supervisory Board of Beiersdorf AG since May 2002 and is the Chairman of Supervisory Board of Maxingvest AG.

33. At all times relevant to this action, Defendant Kleinschmidt is a member of the Executive Board, Human Resources, and Labor Director at Beiersdorf AG.

34. At all times relevant to this action, Defendant MHerz is a member of the Supervisory Board of Maxingvest AG and Tchibo GmbH.

35. At all times relevant to this action, Defendant WHerz is a member of the Supervisory Board of Maxingvest AG.

36. At all times relevant to this action, Defendants were "employers" within the meaning of Title VII, the ADEA, the ERISA, CGS and CGSA.

37. At all times relevant to this action, Defendants were "employers" within the meaning of the ADA at the time the Plaintiff was under the FMLA and after.

38. At all times relevant to this action, Plaintiff was an "employee" within the meaning of Title VII, the ADEA, the ERISA, CGS and CGSA.

39. At all times relevant to this action, Plaintiff was an "employee" within the meaning of the ADA at the time the Plaintiff was under the FMLA and after.

40. At all times relevant to this action, Gleason was acting as an employer within the meaning of Title VII, the ADEA, the ERISA, CGS and CGSA, and held a supervisory capacity over Plaintiff during her employment with Defendants.

41. At all times relevant to this action, Gleason was acting as an employer within the meaning of the ADA at the time the Plaintiff was under the FMLA and after, and held a supervisory capacity over Plaintiff during her employment with Defendants.

42. At all times relevant to this action, Holding was acting as an employer within the meaning of Title VII, the ADEA, the ERISA, CGS and CGSA, and held a supervisory capacity over Plaintiff during her employment with Defendants.

43. At all times relevant to this action, Holding was acting as an employer within the meaning of the ADA at the time the Plaintiff was under the FMLA and after, and held a supervisory capacity over Plaintiff during her employment with Defendants.

44. At all times relevant to this action, Phillips was acting as an employer within the meaning of Title VII, the ADEA, the ERISA, CGS and CGSA, and held a supervisory capacity over Plaintiff during her employment with Defendants until he [Phillips] resigned in July 2007.

45. At all times relevant to this action, Shull was acting as an employer within the meaning of Title VII, the ADEA, the ERISA, CGS and CGSA, and held a supervisory capacity over Plaintiff during her employment with Defendants.

46. At all times relevant to this action, Shull was acting as an employer within the meaning of the ADA at the time the Plaintiff was under the FMLA and after, and held a supervisory capacity over Plaintiff during her employment with Defendants.

47. At all times relevant to this action, Plaintiff was qualified to work in her employment as a computer programmer/systems analyst / SAP Basis/Security Administrator for the Defendants.

## FACTS

48. Plaintiff began her employment with Beiersdorf Inc. on March 4, 1993 as a Sr. Programmer Analyst (AS/400, system administrator) bringing in a wide range of business and IT experience (including system security administration, disaster recovery and EDI). Plaintiff was hired by the Defendants to work as a full time computer programmer/systems analyst maintaining and administering BDF's core business systems at their Norwalk Production Center, located at 360 Martin Luther King Drive, Norwalk, CT.

49. Plaintiff had a large role in the successful implementation of and ongoing support of BDF systems for fifteen (15) years including SAP and EDI: established manuals, procedures including a Disaster Recovery Plan, and schedules for the improvement of BDF business systems worldwide; effectively communicated technical concepts to technical and non-technical personnel worldwide; provided recommendations and guidelines for technical solutions to ensure the desired results were achieved. Knowledge transfer and technical training/documentation were provided to ensure knowledge growth and awareness. Plaintiff was issued a highly confidential EDI User Id and password to access Wal-Mart's Retail Link® software, which with this immense privilege held great responsibility, only trusted and skilled representatives/officers of BDF Inc had access to Retail Link.

50. Plaintiff was promised a promotion in 2001, however, Defendants failed to increase Plaintiff's compensation.

51. On or about February 2003, Phillips was hired by Defendants as a contract consultant, from Clarkston Consulting, to manage BDF's SAP software implementation project.

52. On or about June 2003, the VP of IT for Beiersdorf Inc resigned.

53. On or about January 2004, Phillips was hired by Defendants as a full-time, permanent employee as VP of IT for BDF.

54. On or about January 23, 2004, the Manager of IT Operations/Support for BDF, Plaintiff's manager, resigned.

55. On or about April 6, 2004 Plaintiff discovered that in February 2004, Plaintiff was misled by Phillips, VP of IT, to believe she was would receive a promotion to the open position of Manager of IT Operations/Support.

56. On or about April 6, 2004 through an email announcement, Plaintiff discovered that Gleason was appointed Manager of IT Operations/Support; a younger male who was not qualified for the position.   A copy of Gleason's Organizational Announcement is annexed hereto as "Exhibit D."

57. On or about April 6, 2004, Plaintiff complained to Defendant Phillips, VP of IT regarding Gleason's appointment to Manager of IT Operations/Support.

58. Plaintiff was then ordered by Defendants to use her proprietary skills to train Gleason for the promotion that was promised to her.

59. Plaintiff trained Defendant Gleason and performed the work while Gleason received Plaintiff's promised promotion and compensation.

60. On or about April 2004, Phillips promised Plaintiff would be able to engage in cross training to learn Gleason's field.

61. Later Defendant Gleason continued to use Plaintiff's skills to train a subordinate [Kris Abate].

62. This same subordinate received both Plaintiff's IT skills and cross training to learn Gleason's field from Gleason; the subordinate [Kris Abate], a younger male, was then promoted.   A copy of Kris Abate's Promotion Announcement is annexed hereto as "Exhibit M."

63. Plaintiff never received any training to learn Gleason's field.


## FACTUAL ALLEGATIONS

64. Under new management, Plaintiff was subjected to invidious and intentional acts of discrimination and harassment based on her sex, age, gender and marital status by Gleason, her newly appointed manager.

65. Shortly after Plaintiff complained to Gleason's manager, Phillips, regarding Gleason's unfair treatment and discriminatory behavior Phillips took adverse actions against the Plaintiff in the terms and conditions of her employment creating a hostile work environment.

66. Plaintiff never received a $20,000.00 bonus which she was promised and entitled to.

67. After Plaintiff complained and expressed her concerns, as an expert in the IT field, that Gleason lacked knowledge and needed to go to IT school in order to fulfill the requirements of his promotion.  Phillips retaliated against Plaintiff by threatening her with termination and then ordered her to train Gleason her IT skills; despite knowing the Plaintiff's already heavy workload.

68. The Plaintiff's teaching and training of Gleason significantly increased the Plaintiff's workload creating an additional full-time job that the Plaintiff was not compensated for.

69. After Plaintiff complained Defendants retaliated and penalized the Plaintiff taking advantage of her marital status by increasing her workload which caused Plaintiff to work excessive off-hours to fulfill her own job requirements as well as teaching Peter Gleason.

70. Plaintiff was retaliated against by Defendants because the Plaintiff's teaching and training of Gleason gave the Plaintiff more work in addition to the fact that Plaintiff had less time to do her own work.

71. In August 2005, Plaintiff was harassed by Gleason, who took pictures of the Plaintiff with his company cell phone without Plaintiff's consent; Gleason repeatedly refused to delete Plaintiff's picture, even following repeated requests to do so. A copy of Plaintiff's email complaint to Defendants is annexed hereto as "Exhibit E."

72. Gleason sexually harassed Plaintiff by holding the picture(s) over her; only when the Plaintiff complained to Gleason's then Manager, Phillips, did Plaintiff discover that there were other pictures taken of the Plaintiff. See Exhibit E.

73. Gleason would continually harass Plaintiff about the incident; especially around yearly evaluation time and company picture taking.

74. After Plaintiff complained about Gleason's photography, the Defendants retaliated against her in the terms and conditions of her employment through the creation of a hostile work environment and lowering Plaintiff's evaluations.

75. Gleason repeatedly made unwelcome and derogatory remarks against the Plaintiff and frequently conveyed his low regard for women in the corporate workplace.  Often times making unwelcome comments that were sexual in nature.   His harassing and discriminatory behavior include but is not limited to the following acts:

    (a) commenting about his vasectomy and his sexual activities with his wife and others; such as how he is a one-time sperm shooter that gets his wife pregnant.

(b) many times and in November 2007, Gleason said to me that his wife takes medicine to keep on an even keel and that it really helps her; otherwise she becomes abusive and starts screaming at him and the children to the point that he wanted to rip her head off. He said women really need to be put in their place. Many times he would talk about ripping his wife's head off, how he wants to really punch her out.

(c) speaking about women in a disparaging way for example, he often spoke about a young female colleague and how she wears thin, low cut blouses and bends down to show 'them' (her breasts) to the male executive colleagues in hopes of getting a promotion. She practically puts 'them' (her breasts) in their (male colleagues) face. He also stated, that all of the men laugh at her, while the women make fun of her.

(d) candidly inferring that females should not be employed in superior professional roles over males in the corporate workplace while mocking the current female executives.

(e) indicating to the Plaintiff that the Defendants should not pay her such a high salary because she's a female, stating that the Plaintiff makes a lot of money for a woman.

(f) intimidated Plaintiff with threatening statements about her age, gender and marital status in order to intimidate the Plaintiff to do uncompensated extra work during off-hours, to deny her advancement in the corporation by stating: that the Plaintiff would never find a job at her age, that the Plaintiff should be lucky to have her job and lucky that she is not on the "scott-so" plan, which was a plan designed by Defendants to increase an employee's workload to be unattainable and was used by Defendants in an attempt to terminate an employee.

(g) continuously made racial and gender prejudicial statements about colleagues and their multi-cultural families such as stating that a female Caucasian Vice President has adopted children with "fuzzy hair" because their ethnicity is black.

(h) harassed Plaintiff over an email dialog between the Plaintiff and another women colleague  stating: that it looks like a "cat fight" and how you [Plaintiff] know she likes to fight! That's how they are, I [Peter Gleason] know because I have one at home; my China baby is the same way, it is in their blood."

(i) subjected Plaintiff to disparaging remarks about BDF company presidents: often times, Gleason spoke about former presidents, one married president just adopted a baby and the reason they adopted the baby was because the president was 'gay' and how the president wanted to keep his wife happy. The other married president always had girlfriends because his wife was homely and ill. Plaintiff walked by Gleason's office who was laughing loudly with another male colleague. Gleason said "you should hear this! It's President's (a former married president) girlfriend leaving him a voice mail message about how she is going to meet him at the track." Gleason was listening to the president's voice mail message.

(j) openly spoke about collecting the office name tags of departing employees and Gleason would show them off and tell stories and make fun of these people. Talking about former employee's confidential, personal and business information saying such comments as: Oh yeah this guy, naming the employee, he was fired because he's a pervert.

76. The Plaintiff was repeatedly insulted, humiliated and victimized by Gleason's harassing and discriminatory behavior towards her.

77. Gleason harassed the Plaintiff by downgrading her "soft" skills in her performance appraisal.

78. Defendants discriminated against Plaintiff by denying her opportunities and activities that would lead to her advancing to higher positions in the company despite the Defendant's support, development and advancement of the Plaintiff's male colleagues and subordinates: Peter Gleason, Kris Abate, Hugo Farfan and Bill Longyear. A copy of Hugo Farfan's Organizational Announcement is annexed hereto as "Exhibit N." See Exhibits D, M, N and F.

79. In or around July 2007, the Plaintiff was orally promised a promotion by Defendants, Gleason and Shull, to the position of EDI Lead for BDF USA because the contract for the EDI consultant [Mallik Goli] was expiring.

80. In November 2007, the Plaintiff was orally promised a promotion by Defendant Gleason to the position of Manager of SAP Basis/Security.

81. In the month of December 2007, the Plaintiff used her accrued vacation time to work from home for private medical issues.

82. On Friday, January 4, 2008 it was discovered, through an email, that the Defendants Gleason and Shull discriminated against the Plaintiff by failing to promote her to the position of EDI Lead for BDF USA; BDF management appointed the position to a male [Bill Longyear] who had less experience in the EDI field. A copy of Defendant Shull's email response with the EDI email announcement is annexed hereto as "Exhibit F."

83. On Friday, January 4, 2008, Plaintiff complained in an email to Defendants. See Exhibit F.

84. On Friday, January 4, 2008 Defendants, Gleason and Shull, retaliated against Plaintiff in their email responses by making false and harassing statements basing their statements/decisions on Defendant Gleason's false accusations. A copy of Defendant Gleason's email response with the EDI email announcement is annexed hereto as "Exhibit G." See Exhibits F and G.

85. On Friday, January 4, 2008, Plaintiff made complaints against Gleason to his manager, President, Iain R. Holding, in person regarding the numerous incidents of unwelcome comments, sexual comments, threats, harassment, and discrimination that Plaintiff has been subjected to currently and over the past years of employment with Gleason and others. Plaintiff followed up with emails.

86. On Friday, January 4, 2008 after Plaintiff made complaints to Defendant President Iain R. Holding, Defendant Shull retaliated in person by making false and harassing statements.

87. On Monday, January 7, 2008, Defendant Gleason retaliated against Plaintiff by entering the Plaintiff's office and harassing her over the complaints that she made to Defendant's manager President, Iain R. Holding. Furthermore, Gleason would frighten Plaintiff by stating that Gleason is taking classes for his anger management issues. Defendant Gleason told Plaintiff that he goes to see a man who lives in a shack that looks like the crypt keeper and is teaching Gleason how to breathe when he [Gleason] gets anxiety.

88. The next day, on Tuesday, January 8, 2008, Defendant Gleason retaliated against Plaintiff by entering the Plaintiff's office and accusing her of violating a security breach and other false accusations orally and then in writing after the Plaintiff made a complaint against Defendant Gleason to his manager, President Iain R. Holding on Friday, January 4, 2008.

89. Plaintiff filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") orally on January 8, 2008 and then in writing on February 7, 2008 against Beiersdorf for failure to promote in a hostile work environment involving age and sex discrimination, harassment as well as retaliation.

90. Plaintiff's complaints were filed with the Connecticut Commission on Human Rights and Opportunities ("CHRO") as cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

91. Plaintiff informed, in person, Beiersdorf's HR Defendant Wilcox that Plaintiff filed discrimination/harassment complaints with the President of BDF Inc. and filed a pending complaint with the CHRO.

92. Defendant, Iain R. Holding, President of BDF Inc. violated BDF Inc. harassment policies that were signed by him. A copy of BDF's Harassment Policy and Affirmative Action and Equal Employment Policy is annexed hereto as "Exhibit H."

93. Defendants BDF Inc HR personnel Hiott and Hoque were aware of the Plaintiff's complaints and retaliated against Plaintiff by violating BDF's Harassment policy. See Exhibit H.

94. Defendant, Iain R. Holding retaliated against Plaintiff by allowing Defendants Gleason, Shull, Williams, Hiott and Hoque, all of BDF Inc HR and BDF AG to retaliate against Plaintiff.

95. Defendant, Iain R. Holding was an aider and abettor of Gleason and Shull's, all of HR including the parent companies located in Germany known as BDF AG and Maxingvest AG to also retaliate against Plaintiff.

96. On January 9, 2008 Plaintiff sought medical attention.

97. On Sunday January 13, 2008 doctor's note was delivered to Defendant.

98. On or about Monday, January 14, 2008 Plaintiff began the Family & Medical Leave Act (FMLA).

99. Throughout the process of the Plaintiff filing complaints, Defendants continuously harassed and retaliated against Plaintiff:

(a) Gleason and others retaliated against Plaintiff with false accusations after Plaintiff engaged in a protected activity.

(b) Defendant Holding and others retaliated against Plaintiff by violating BDF Inc's Harassment policy after Plaintiff engaged in a protected activity. See Exhibit H.

(c) On January 9, 2008, Gleason, Shull and "others" retaliated against Plaintiff by continuing their attack on Plaintiff's proprietary right to her good name, her reputation and her lifetime skills/career with many false accusations/statements and made up stories in writing, then gave the documents to a third party and published the documents by making them public record, that harmed Plaintiff, after Plaintiff filed past and present complaints and before the statements/documents were made part of a judicial proceeding.

(d) On Friday, January 11th 2008 at approximately 4:30 pm, Defendant Williams, Manager of HR, telephoned and retaliated against Plaintiff by accusing her of Gleason's false accusations after Plaintiff made a complaint against Gleason on Friday, January 4, 2008.

(e) On January 16th 2008 Plaintiff filed a police report. Plaintiff was concerned about her safety because Gleason spoke about guns and making people disappear. A copy of the police report filed as a harassment complaint is annexed hereto as "Exhibit L."

(f) On or about April 1, 2008, Plaintiff became aware of Defendants' (Gleason and Shull) defamatory emails dated January 9, 2008 that harassed and harmed the Plaintiff; also Plaintiff discovered many new false accusations against her by Defendants and now "others" in collaboration; Defendants continued to retaliate against the Plaintiff through and outside the CHRO/EEOC.

(g) On or about April 1, 2008, Plaintiff also discovered that Defendant Williams had lied to Plaintiff on January 11, 2008 regarding having received the January 9, 2008 emails from Gleason and Shull that were addressed to her [Williams].

(h) In April 2008 Plaintiff was repeatedly lied to and harassed by Defendant Nenner over Plaintiff's request to obtain a copy of her [Plaintiff's] own personnel file resulting in Plaintiff having to send the Connecticut General Statute to justify the Plaintiff's request.

(i) On April 11, 2008 Defendant Williams refused to witness and verify the contents of the Plaintiff's copy of Plaintiff's personnel file that was originally requested of Defendant Nenner and prepared and mailed by Defendant Wilcox.

(j) On or about April 11, 2008, Defendants' (Gleason and Shull) January 9, 2008 emails were not included in Plaintiff's copy of Plaintiff's personnel file that was prepared and mailed to Plaintiff by Defendant Wilcox.

(k) Defendants Beiersdorf's HR personnel (Nenner, Williams and Wilcox) did not accommodate Plaintiff during and after Short Term Disability (STD) and Long Term Disability (LTD) periods knowing Plaintiff's disability, requesting and requiring unreasonable activities beyond her [Plaintiff's] medical capabilities.

(l) Defendants did not complete and satisfy Plaintiff's May 2008 requests for the current annual reports, plan/policy documents and the most recent 2008 copy of the "Summary Plan(s) Description" for each plan/policies by not providing documents as requested; On Monday, August 11, 2008 Plaintiff contacted the US Department of Labor in regards to Plaintiff's ERISA requests.

(m) Defendants Beiersdorf's HR personnel (Wilcox) changed Plaintiff's FMLA start-date by five (5) days.

(n) Defendant Beiersdorf's HR personnel (Wilcox) misled Plaintiff and demanded private medical records/information beyond what was required.

(o) Defendant Beiersdorf's HR personnel (Wilcox) assured Plaintiff that Plaintiff's medical and HR issues would be kept confidential in which they were not.

(p) Defendants BDF's legal counsel [Michael J. Soltis and Alison Jacobs Wice of Jackson Lewis], who are not the Plan Administrator(s) nor are they the Plaintiff's attorneys, continually interfered with Plaintiff's personal/private issues; exposing Plaintiff's medical condition and participating in Plaintiff's private medical, financial and employment affairs to a third party without her permission; A copy of Plaintiff's email regarding group plan(s) participation and requesting Defendants to cease bouncing Plaintiff's emails is annexed hereto as "Exhibit I." Beiersdorf's legal counsel has stated "Beiersdorf does not require your [Plaintiff's] permission or agreement to refer these issues to counsel". The Plaintiff retains the legal rights to sue BDF's attorneys at a later date.

(q) Defendants BDF Inc. harassed and retaliated against Plaintiff by violating Plaintiff's right to privacy, the HIPAA privacy rule and the ERISA, etc. by repeatedly "bouncing" Plaintiff's emails to a third party [their legal counsel], who are not the Plan Administrator(s), and by prohibiting the Plaintiff to directly communicate with Beiersdorf over many personal/private issues; exposing and allowing a third party to participate in Plaintiff's private medical, financial and employment affairs without her permission. See Exhibit I.

(r) Defendants BDF Inc. harassed and retaliated against Plaintiff by not accommodating Plaintiff knowing her medical condition by ignoring and denying Plaintiff direct contact with the HR Department by repeatedly "bouncing" her emails to a third party; exposing and allowing a third party to participate in Plaintiff's private medical, financial and employment affairs without her permission. See Exhibit I.

(s) Defendants Beiersdorf's HR personnel (Nenner, Williams and Wilcox) continued to retaliate against Plaintiff with such acts as: breaching agreements, misleading information regarding: employment status, health benefits including COBRA and HIPAA, life insurance, 401K, pension, group plans and policies without an employee handbook or written policies.

(t) Beiersdorf's HR personnel (Nenner, Williams and Wilcox) then continued and more aggressively harassed, discriminated and retaliated against Plaintiff to the extent that Defendants threatened Plaintiff with her benefits with an 'if any' ultimatum as Plaintiff continued to exercise her protected right to file complaints with the CHRO knowing Plaintiff's medical condition.

(u) The Defendants Beiersdorf's HR personnel (Nenner, Williams and Wilcox) retaliated by interfering and denying Plaintiff's group plan options, that are known to be available to employees; refusing to disclose the name of the Plan Administrator(s) and the licensed Actuary Statistician; and did not tell the plan participant [Plaintiff] how to submit for a full and fair review because of a denial, after the Plaintiff engaged in a protected activity by making complaints of discrimination and harassment that were filed with the CHRO/EEOC.

(v) The Defendants' Beiersdorf's HR personnel entered into an agreement and cashed checks to continue Plaintiff's group plan life insurance participation, and then, as Plaintiff continued to file complaints, the Defendants' retaliated by breaching the agreement, terminating Plaintiff's group plan life insurance participation and returning the checks and then denied the Plaintiff her right to a full fair review.

(w) The Defendants' Beiersdorf's HR personnel retaliated by terminating Plaintiff's group plan medical insurance participation and denying Plaintiff her right to a full fair review.

(x) After Plaintiff filed complaints with the CHRO, Defendants Beiersdorf's HR personnel (Nenner, Williams and Wilcox) and Gleason retaliated by breaching an agreement and refusing to give Plaintiff her 2007 performance appraisal, when she was told it was completed.

(y) After Plaintiff filed complaints with the CHRO, Defendants Beiersdorf's HR personnel (Nenner, Williams and Wilcox) and Gleason retaliated by breaching an agreement and refusing to give Plaintiff her 2007 annual salary increase as promised, knowing it would affect Plaintiff's long term medical benefits.

(z) Defendants' failure to promote Plaintiff in 2001, 2004, 2007 (SAP) & 2007 (EDI) and failure to compensate Plaintiff for a promised 2007 annual salary increase [due in January 2008] caused economic loss to Plaintiff and to Plaintiff's benefit plan contributions and income: pension plan and 401K including LTD disability benefit.

(aa) At one point, BDF HR Department began hand-delivering correspondence to Plaintiff's post office box, two towns over from where the company is located.  BDF has an in-house company mail center and a local post office/box less than two miles away from the company located in Norwalk, CT.

(bb) Defendant BDF HR Department circumvented around proper US Postal procedures by physically driving and delivering a postal meter-stamped letter from their own internal mailroom in Norwalk, CT to Plaintiff's post office box two towns over from where the company is located and making a false accusation to a US Postal employee to ensure hand-delivery of the letter.

(cc) Plaintiff was not accommodated under the Americans with Disabilities Act (ADA): Defendants were aware that the Plaintiff was disabled during Plaintiff's STD leave per a doctor's note. Medical records and an MRI report by an MD also confirmed Plaintiff's medical condition. The Defendants misled and breached a separate employment agreement that would protect Plaintiff's current specific job until the Plaintiff's doctor could evaluate her condition; and then, the Defendants retaliated by terminating Plaintiff's employment after Plaintiff continued to file her discrimination charges/complaints with the CHRO.

(dd) Shortly after Plaintiff was terminated, the Plaintiff received a personal letter from Defendant Williams stating, she [Kathy Williams] cleaned out Plaintiff's office; after ignoring Plaintiff's requests to have someone or herself collect her own personal items during off-hours, like other employees. To date, Plaintiff is missing many personal items, etc.

(ee) Defendants accused Plaintiff of not participating in a post-termination benefits telephone conference after Defendants set up an unconfirmed appointment with Plaintiff without Plaintiff's knowledge, and then in a letter dated September 16, 2008 Defendants accused Plaintiff of failing to participate in the conference.

(ff) Defendant (Amy Nenner) stated in writing on September 16, 2008 the reasons why the Defendants were not able to communicate with Plaintiff in a "fair, reasonable and professional way".

100. After filing the initial complaint(s) with BDF Inc. and the CHRO; Beiersdorf had and still continued to retaliate, harass and discriminate against Plaintiff. Plaintiff filed complaints of retaliation with the Commission on Human Rights and Opportunities ("CHRO").

101. The Connecticut Commission on Human Rights and Opportunities ("CHRO") deemed that all of the Complainant's [Plaintiff's] complaints were retained for full investigation and that the Merit Assessment Review (MAR) determined that all of the Complainant's [Plaintiff's] complaints allege viable claims".

102. Once BDF Inc. began to retaliate, Plaintiff contacted the parent company BDF AG located in Hamburg, Germany. Markus Pinger and Thomas-Bernd Quaas, through their staff led Plaintiff to believe that they were concerned and are taking Plaintiff's complaints seriously. There were telephone conversations where the parent company said they would investigate this matter. The parent company BDF AG, Markus Pinger and Thomas-Bernd Quaas misled, deceived, and also retaliated against Plaintiff. Defendants Pinger and Quaas through their staff became non-communicative after inviting Plaintiff to call back. Defendant Pinger categorized Plaintiff's emails as "junk mail".

103. Once the parent company BDF AG began to retaliate, Plaintiff then contacted the holding company Maxingvest AG. The holding company controls and monitors both subsidiaries BDF AG (Germany) and BDF Inc. (USA). Dr. Arno Mahlert and, the Herz family board members [MHerz and WHerz] were contacted via fax and mail. Dr. Markus Conrad's office was contacted via telephone, fax and mail. The holding company's personnel requested Plaintiff to send all of the information to them and they would investigate. The holding company did not follow through with their promise to investigate this matter; Plaintiff was misled and lied to on many occasions. A copy of an email dialog with Hamburg, Germany dated July 2008 is annexed hereto as "Exhibit J."

104. Once the holding company Maxingvest AG began to retaliate, Reinhard Pöllath's office was also contacted regarding Plaintiff's complaints. His office personnel stated that they would investigate this matter and that Reinhard Pöllath would personally contact Plaintiff; in which he never did.

105. Once BDF began to retaliate, the parent company [BDF AG], the holding company [Maxingvest AG] and Reinhard Pöllath and their staff [Veronika, Gistala, Susanne, Christine Bueutel, Christine Frham, Miss Coordt and Miss Ross and other staff members]   as well as the Board of Directors via fax and mail also retaliated against Plaintiff.

106. Beiersdorf Inc., Beiersdorf AG, Maxingvest AG, the Board of Directors as well as the Corporate Responsibilities Department are all aware of my complaints and were contacted by telephone, email, fax, and return receipts.

107. At any point, President Iain R. Holding and any of the executive members of the corporations including the Herz family board members [MHerz and WHerz] had the opportunity to address Plaintiff's complaints; instead he/they chose to continue to ignore Plaintiff's complaints and have allowed the disabled Plaintiff to be further harassed and retaliated against by Defendant Gleason, BDF Inc., BDF HR, the parent company [BDF AG], Defendant Kleinschmidt, the holding company [Maxingvest AG] and Defendant Reinhard Pöllath and as well as their board members who were all aware of Plaintiff's complaints.

108. Upon information and belief, Defendant Iain Holding had knowledge of the other Defendants' harassment, discriminatory and retaliatory behavior toward Plaintiff but failed to take any type of remedial actions against them.

109. At all times relevant to this action, Defendant Holding aided and abetted in the discriminatory conduct and/or subsequently condoned it by failing to exercise reasonable care to prevent and correct promptly discriminatory and or retaliatory acts perpetuated by Defendants against the Plaintiff in her employment.

110. Shortly, after the Plaintiff complained about discrimination, harassment, retaliation and failure to promote in a hostile work environment to Defendants and filed complaints with the CHRO, Defendants continued to retaliate against Plaintiff.

111. To date, Defendants continue to hold false accusations over Plaintiff.

112. Alison Jacobs Wice of Jackson Lewis counsel for Beiersdorf, only contacted the CHRO 'one-time' on September 24, 2008 in regards to initiating the conciliation effort; almost nine (9) months into the process.   During CHRO's early conciliation effort BDF offered $8,000.00.  This offer was unacceptable in view of the facts of the Plaintiff's complaints.  A copy of Plaintiff's email response to Defendants' offer during the CHRO early conciliation effort is annexed hereto as "Exhibit K."

113. Plaintiff had a separate employment agreement with the Defendants that would allow Plaintiff to keep her current specific job.   Defendant's retaliated and breached this private employment agreement with Plaintiff because she continued to utilized her protected right to file complaints with the CHRO; resulting in wrongful termination.

### FIRST CAUSE OF ACTION AGAINST DEFENDANTS
(Sexual Harassment Discrimination under Title VII)

114. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 113 as if fully set forth at length herein.

115. Title VII of the Civil Rights Act of 1964, as amended, creates statutory rights against invidious discrimination and harassment based upon sex in the terms, conditions, or privileges of employment.

116. Based upon the acts and practices as alleged above, including but not limited to subjecting Plaintiff to unwelcome sexual behavior, conversations and/or comments, the Plaintiff was subjected to invidious discrimination and harassment based upon her sex.

117. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

118. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under Title VII.

### SECOND CAUSE OF ACTION AGAINST DEFENDANTS
(Sexual Harassment Discrimination under Conn. GS §46a-60(a)(1))

119. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 118 as if fully set forth at length herein.

120. Section 46a-60(a)(1) of the Connecticut General Statutes, creates statutory rights against invidious discrimination and harassment based upon sex in the terms, conditions, or privileges of employment.

121. Based upon the acts and practices as alleged above, including but not limited to subjecting Plaintiff to unwelcome sexual behavior, conversations and/or comments, the Plaintiff was subjected to invidious discrimination and harassment based upon her sex.

122. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

123. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the Connecticut General Statutes.

### THIRD CAUSE OF ACTION AGAINST DEFENDANTS
(Age Discrimination under the ADEA)

124. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 123 as if fully set forth at length herein.

125. The ADEA, creates statutory rights against invidious discrimination and harassment based upon age in the terms, conditions, or privileges of employment.

126. Based upon the acts and practices as alleged above, including but not limited to subjecting Plaintiff to unwelcome comments, and/or selecting younger, less experienced individuals for promotions, the Plaintiff was subjected to invidious discrimination and harassment based upon her age.

127. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

128. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages and any other damages available under the ADEA.

### FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
(Marital Status Discrimination under Conn. GS §46a-60(a)(1))

129. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 128 as if fully set forth at length herein.

130. Section 46a-60(a)(1) of the Connecticut General Statutes, creates statutory rights against invidious discrimination and harassment based upon marital status in the terms, conditions, or privileges of employment.

131. Based upon the acts and practices as alleged above, including but not limited to assigning Plaintiff more work because she is single, the Plaintiff was subjected to invidious discrimination and harassment based upon her marital status.

132. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

133. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the Connecticut General Statutes.

### FIFTH CAUSE OF ACTION AGAINST DEFENDANTS
(Discrimination in Compensation Due to Sex under Conn. GS §31-75)

134. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 133 as if fully set forth at length herein.

135. Section 31-75 of the Connecticut General Statutes, creates statutory rights against invidious pay disparities based upon sex in the terms, conditions, or privileges of employment.

136. Based upon the acts and practices as alleged above, including but not limited to compensating Plaintiff less than they would compensate her if she were a man, the Plaintiff was subjected to invidious discrimination and harassment based upon her sex.

137. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

138. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the Connecticut General Statutes.

### SIXTH CAUSE OF ACTION AGAINST DEFENDANTS
(FMLA Discrimination under Conn. GSA §31-51pp)

139. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 138 as if fully set forth at length herein.

140. Section 31-51pp of the Connecticut General Statutes Annotated, creates statutory rights against invidious discrimination with respect to an employee's FMLA rights in the terms, conditions, or privileges of employment.

141. Based upon the acts and practices as alleged above, including but not limited to pushing back Plaintiff's FMLA start-date by five (5) days, the Plaintiff was subjected to invidious discrimination and harassment based upon her FMLA rights.

142. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

143. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the Connecticut General Statutes Annotated.

## SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
(Hostile Work Environment under Title VII)

144. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 143 as if fully set forth at length herein.

145. Pursuant to Title VII of the Civil Rights Act of 1964, as amended, it is an unlawful employment practice for an employer to create or condone a work environment permeated with discriminatory intimidation that is sufficiently severe or pervasive to alter the conditions of [Plaintiff's] work environment.

146. Based upon the defendants' discriminatory and harassing acts and practices as alleged above the Plaintiff was subjected to a workplace which was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe and pervasive enough to alter the conditions of her work environment.

147. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

148. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under Title VII.

## EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS
(Hostile Work Environment under Conn. GS §46a-60(a)(1))

149. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 148 as if fully set forth at length herein.

150. Pursuant to Conn. GS §46a-60(a)(1), it is an unlawful employment practice for an employer to create or condone a work environment permeated with discriminatory intimidation that is sufficiently severe or pervasive to alter the conditions of [Plaintiff's] work environment.

151. Based upon the defendants' discriminatory and harassing acts and practices as alleged above the Plaintiff was subjected to a workplace which was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe and pervasive enough to alter the conditions of her work environment.

152. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

153. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under Conn. GS §46a-60(a)(1).

## NINTH CAUSE OF ACTION AGAINST DEFENDANTS
(Retaliation in Violation of Title VII)

154. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 153 as if fully set forth at length herein.

155. Pursuant to Title VII of the Civil Rights Act of 1964, as amended, it is an unlawful employment practice for an employer to take retaliatory adverse employment actions against employees who engaged in protected activities.

156. Based upon the defendants' retaliatory acts and practices as alleged above the Plaintiff was retaliated against for making complaints of discrimination, resulting in an adverse employment action.

157. Defendants condoned the retaliatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

158. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under Title VII.

## TENTH CAUSE OF ACTION AGAINST DEFENDANTS
(Hostile Work Environment under Conn. GS §46a-60(a)(4))

159. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 148 as if fully set forth at length herein.

160. Pursuant to Conn. GS §46a-60(a)(4), it is an unlawful employment practice for an employer to create or condone a work environment permeated with discriminatory intimidation that is sufficiently severe or pervasive to alter the conditions of [Plaintiff's] work environment.

161. Based upon the defendants' retaliatory acts and practices as alleged above the Plaintiff was retaliated against for making complaints of discrimination, resulting in an adverse employment action.

162. Defendants condoned the retaliatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

163. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under Conn. GS §46a-60(a)(4).

### ELEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
(Discrimination under the ADA)

164.  Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 163 as if fully set forth at length herein.

165.  The ADA, creates statutory rights against invidious discrimination and harassment in all employment practices, including: promotion(s), benefits, and leave.

166.  Based upon the acts and practices as alleged above, including but not limited to such acts as:  refusing to give Plaintiff her annual salary increase as promised; denying requested reasonable accommodation(s); terminating Plaintiff's group plan(s) participation, the Plaintiff was subjected to invidious discrimination and harassment based upon her disability under the ADA while engaged in a protected activity during and after Plaintiff's FMLA and under LTD Disability resulting in an adverse employment action.

167.  Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

168.  Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the ADA.

### TWELFTH CAUSE OF ACTION AGAINST DEFENDANTS
(Retaliation in Violation of ADA)

169.  Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 168 as if fully set forth at length herein.

170.  Pursuant to the Americans with Disabilities Act (ADA), it is an unlawful employment practice for an employer to retaliate against an employee based on an employee's disability who engaged in protected activities, during and after employee's FMLA and under LTD Disability.

171.  Based upon the acts and practices as alleged above, including but not limited to such acts as: breaching agreements, misleading information regarding: employment status, health benefits including COBRA and HIPAA, life insurance, 401K, and group plans and policies without an employee handbook; violating medical privacy;  intimidating Plaintiff from filing complaints;  ignoring and refusing to address Plaintiff's complaints; interfering by denying Plaintiff's direct communications with Defendants; responding with misleading interpretation and inaccurate information; the Plaintiff was subjected to retaliation based upon her disability under the ADA while engaged in a protected activity, during and after Plaintiff's FMLA and under LTD Disability resulting in an adverse employment action.

172. Defendants condoned the retaliatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary damages, for inter alia, mental anguish, emotional distress, and humiliation.

173. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the ADA.

**THIRTEENTH CAUSE OF ACTION AGAINST DEFENDANTS**
(Discrimination under ERISA)

174. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 173 as if fully set forth at length herein.

175. The ERISA, creates statutory rights against invidious discrimination with respect to an employee's rights in the terms, conditions, and/or privileges of employee benefit plans, including health care and pension plans; setting requirements for benefit participation, funding, vesting as well as setting standards for reporting, disclosure and fiduciary duties; ERISA prohibits "employers from terminating, suspending, expelling, disciplining or discriminating against employees for exercising or attempting to exercise their rights under an ERISA benefits plan".

176. Based upon the acts and practices as alleged above, including but not limited to such acts, that occurred while Plaintiff was engaged in a protected activity during and after Plaintiff's FMLA and under LTD Disability, as: breaching agreements, misleading information over: employment status, health benefits including COBRA and HIPAA, life insurance, 401K, and group plans and policies without an employee handbook or written policies; prohibited Plaintiff's direct communication with plan administrators by "bouncing" Plaintiff's private emails to a third party; did not provide Plaintiff with all necessary plan information; ignoring and refusing to address Plaintiff's complaints; terminating Plaintiff's group plan participation; refusing to give Plaintiff her annual salary increase as promised and pushing back Plaintiff's FMLA start-date by five (5) days resulting in an economic loss to Plaintiff's ERISA benefits; the Plaintiff was subjected to invidious discrimination and harassment based upon her ERISA rights.

177. Defendants condoned the discriminatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

178. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the ERISA.

## FOURTEENTH CAUSE OF ACTION AGAINST DEFENDANTS
(Retaliation in Violation ERISA)

179. Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 178 as if fully set forth at length herein.

180. The ERISA, creates statutory rights against retaliation making it unlawful to "discharge, fine, suspend, discipline or discriminate against a participant in an employee benefit plan for exercising any right under ERISA or an ERISA benefit plan or for the purpose of interfering with any right to which a plan participant may become entitled under ERISA or a benefit plan"; the ERISA includes a retaliation statute that prohibits employers from retaliating against an employee because the employee sought or obtained benefits.

181. Based upon the acts and practices as alleged above, including but not limited to such acts, that occurred while Plaintiff was engaged in a protected activity during and after Plaintiff's FMLA and under LTD Disability, as: breaching agreements, misleading information over: employment status, health benefits including COBRA and HIPAA, life insurance, 401K, and group plans and policies without an employee handbook or written policies; prohibited Plaintiff's direct communication with plan administrators by "bouncing" Plaintiff's private emails to a third party; did not provide Plaintiff with all necessary plan information; ignoring and refusing to address Plaintiff's complaints; interfering and denying Plaintiff's group plan options; terminating Plaintiff's group plan participation; refusing to give Plaintiff her annual salary increase as promised and pushing back Plaintiff's FMLA start-date by five (5) days resulting in an economic loss to Plaintiff's ERISA benefits; the Plaintiff was subjected to retaliation based upon her ERISA rights.

182. Defendants condoned the retaliatory acts and practices as alleged above, and as a result, the Plaintiff has suffered and will continue to suffer substantial losses, including losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary and compensatory damages, for *inter alia*, mental anguish, emotional distress, and humiliation.

183. Defendants acted intentionally and with malice and reckless indifference to Plaintiff's federally protected rights and are thereby liable to Plaintiff for compensatory damages under the ERISA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants for, where applicable, all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, reinstatement of medical and group plan coverage and any other damages permitted by law.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 33(b) of the Federal Rules of Civil Procedure, a trial by jury in this action

Dated: New Haven, Connecticut
        March 31, 2010

By: Debra Lee Kraus

Debra Lee Kraus
P.O. Box 192
Greens Farms, CT 06838-0192

# EXHIBIT

# A

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Debra L. Kraus<br>P.O. Box 192<br>Greens Farms, CT 06838 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2008-00659 | Anne R. Giantonio,<br>Intake Supervisor | (617) 565-3189 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ ]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[ ]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[X]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Robert L. Sanders,
**Area Office Director**

JUL 2 7 2009
*(Date Mailed)*

Enclosures(s)

cc:   **BEIERSDORF, INC.**
      **360 Martin Luther King, Jr. Drive**
      **Norwalk, CT 06854**

# EXHIBIT B

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| | |
|---|---|
| To:  Debra L. Kraus<br>P.O. Box 192<br>Greens Farms, CT 06838 | From:  Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |

CORRECTED

☐  On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2008-00659 | Anne R. Giantonio,<br>Intake Supervisor | (617) 565-3189 |

NOTICE TO THE PERSON AGGRIEVED:

(See also the additional information enclosed with this form.)

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X]  More than 180 days have passed since the filing of this charge.

[ ]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

[ ]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[X]  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_Robert L. Sanders,_ (signature)

**Robert L. Sanders,**
**Area Office Director**

07/27/2009

Enclosures(s)

(Date Mailed)

cc:  **BEIERSDORF, INC.**
**360 Martin Luther King, Jr. Drive**
**Norwalk, CT 06854**

# EXHIBIT

# C

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Debra Lee Kraus<br>P.o. Box 192<br>Greens Farms, CT 06838 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2008-01366 | **Anne R. Giantonio,**<br>Intake Supervisor | **(617) 565-3189** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Robert L. Sanders,
Area Office Director

OCT 3 0 2009

*(Date Mailed)*

Enclosures(s)

cc:   **BEIERSDORF INC**
**360 Dr Martin Luther Knig Drive**
**Norwalk, CT 06854**

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:   Debra Lee Kraus<br>Po Box 192<br>Greens Farms, CT 06838 | From:   Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |

☐  *On behalf of person(s) aggrieved whose identity is*
   *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2008-01658 | Anne R. Giantonio,<br>Intake Supervisor | (617) 565-3189 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐   More than 180 days have passed since the filing of this charge.

☐   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

_____
Robert L. Sanders,
Area Office Director

OCT 3 0 2009
*(Date Mailed)*

cc:   **BEIERSDORF INC**
     **360 Dr. Martin Luther King Drive**
     **Norwalk, CT 06854**

EEOC Form 161-B (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Debra Lee Kraus
Po Box 192
Greens Farms, CT 06838

From: **Boston Area Office**
**John F. Kennedy Fed Bldg**
**Government Ctr, Room 475**
**Boston, MA 02203**

☐  *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2009-00148 | **Anne R. Giantonio,** **Intake Supervisor** | **(617) 565-3189** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

Robert L. Sanders,
**Area Office Director**

**OCT 3 0 2009**
*(Date Mailed)*

Enclosures(s)

cc:  **BEIERSDORF INC**
**360 Dr. Martin Luther King Drive**
**Norwalk, CT 06854**

# EXHIBIT

# D

# ORGANIZATIONAL ANNOUNCEMENT
April 6, 2004

I am pleased to announce that Pete Gleason has accepted a promotion to Manager of IT Support and Operations.

Pete has been part of the Beiersdorf organization in Norwalk since 1988.  From 1988 to 1997 Pete served as the Maintenance Manager within the Engineering Department.  In 1997, Pete joined the IT Department as the Telecommunications Manager.  During his entire career here, Pete has focused on delivering high-quality service to Beiersdorf.  With his positive, service-oriented attitude Pete has built strong relationships across the organization that he leverages to deliver strong solutions.  Pete's consistent focus on delivering value makes him the ideal candidate for the new Manager of IT Support and Operations within the IT Department.

Pete's new role broadens his responsibility to include delivering and managing end-user support, user workstation support, network support, AS/400 operations, and telecommunications.  In this role, Pete is also responsible for managing our new Technology Service Center.

I am excited to have Pete as part of our team in this role.  Please join me in congratulating him on his new promotion.

---

Jason Phillips
Vice President, Information Technology

# EXHIBIT

# E

**From:** Phillips, Jason /BDF LGA
**Sent:** Thursday, August 25, 2005 2:06 PM
**To:** Gleason, Pete /BDF LGA; Kraus, Debra /BDF LGA
**Subject:** RE: Personal Request
Deb,

As we discussed in our meeting earlier today, Pete has removed all pictures of you from his cell phone. Earlier in the year, Pete had captured pictures of several staff members and associated the pictures to telephone numbers within his cell phone contact list. This helped to identify incoming callers when he received a call on his phone.

At this point, all staff photos, including yours, have been deleted from Pete's phone.

I trust this resolves your concern.

-Jason

Beiersdorf North America
(203) 854-8124
jphillips@bdfusa.com


**From:** Gleason, Pete /BDF LGA
**Sent:** Thursday, August 25, 2005 8:32 AM
**To:** Kraus, Debra /BDF LGA
**Cc:** Phillips, Jason /BDF LGA
**Subject:** RE: Personal Request

Deb,
I did delete that picture when you first requested it. I have since changed my cell phone and done a "hard reset" on the old unit so there is no information on it what so ever.

Pete


**From:** Kraus, Debra /BDF LGA
**Sent:** Thursday, August 25, 2005 8:27 AM
**To:** Gleason, Pete /BDF LGA
**Cc:** Phillips, Jason /BDF LGA
**Subject:** Personal Request
**Importance:** High

Pete,

Please delete my picture from your cell phone and remove any downloaded versions; any hardcopies, I want returned to me.

From the onset, I was not comfortable with this.

I did not give you permission to take my picture - months ago.

As I recall, I was sitting at my desk and you came to my office said "smile" and then took the picture.

When you took the picture I told you that I didn't like it, you said "Oh, but it is such a nice picture" and then left my office.

I made a second attempt to request to have the picture removed by going to your office and saying " I really don't like it, please get rid of the picture" and again you said "Oh, but it is a nice picture" and went on to answering the telephone.

I am sending you this e-mail now because I do not know what else to do in order to get my point across.

This type of picture does not belong on someone's telephone or PC, this picture belongs in my family's photo album - My family is not happy about this.

I want written assurance that there is not any remnants of this photo anywhere, any hardcopies I want returned to me.

Please respond to this e-mail that this has been taken care of.


Thank you,

Deb Kraus

**Debra Lee Kraus**
Beiersdorf North America
360 Dr. Martin Luther King Drive
Norwalk, CT 06854
**Phone: (203) 854-8002**
Fax: (203) 854-8244
**Email: <u>dkraus@bdfusa.com</u>**

# EXHIBIT

# F

**From:** Shull, Lee /BDF LGA
**Sent:** Friday, January 04, 2008 9:57 AM
**To:** Kraus, Debra /BDF LGA; Gleason, Pete /BDF LGA
**Subject:** RE: Mallik's Contract and Our EDI Solutions
Hi Deb,

Please accept my apologies; this was a decision that was made after initially speaking with Pete about you being the primary person. After some thought I changed my position and I'd discussed this with Pete. I should have made sure he discussed it with you before I sent this email out. I have a meeting at 10 but can stop by afterwards to talk more about this.

Best regards,
Lee Shull

Business Applications Manager
Beiersdorf Inc.
lshull@bdfusa.com
(203) 854-8137

---

**From:** Kraus, Debra /BDF LGA
**Sent:** Friday, January 04, 2008 9:50 AM
**To:** Shull, Lee /BDF LGA; Gleason, Pete /BDF LGA
**Subject:** Mallik's Contract and Our EDI Solutions

Hello Lee / Pete,

I very disappointed with this email because this opportunity was verbally promised to me and I accepted the offer, how could this position be given to someone else.

Regards,
Deb Kraus

---

**From:** Shull, Lee /BDF LGA
**Sent:** Friday, January 04, 2008 9:12 AM
**To:** DaSilva, Fabio /BDF LGA; Dunn, Ino /BDF LGA; Farfan, Hugo /BDF LGA; Goli, Mallik /BDF LGA; Lanese, David /BDF LGA; Longyear, Bill /BDF LGA; Losty, Jennifer /BDF LGA; Osborne, Mary Beth /BDF CVG; Kraus, Debra /BDF LGA; Mucci, Eric /BSS LGA; Smith, Julie /BDF HPN; Savage, Diane /BDF LGA; Abate, Kristopher /BDF LGA
**Cc:** Gleason, Pete /BDF LGA; Dubucq, Jacques /BSS HAM; Holding, Iain /BDF HPN; Wohlert, Ralf Dr. /BSS HAM; Machata, Michael /BDF VIE; Wynne, Neil /BDF HPN
**Subject:** Mallik's Contract and Our EDI Solutions

All,

I wanted to make you aware of a decision that has been made in regards to Mallik's contract with us. We've extended it through June of this year at which time we will assume responsibility for EDI functionality ourselves. Mallik has provided a great service to us over the past few years and his expertise has helped us stabilize and expand our EDI capabilities. He has done a great job working with BSS to migrate our solutions to the Hamburg based Seeburger solution.

Because of this state of stability and maturity combined with the need to bring the EDI knowledge and experience in house, Bill will be the primary person responsible for EDI solutions. As with Mallik, Bill can not do this alone and will rely on others within the IT group for support in ensuring

the EDI solution as a whole supports our business needs. Mallik, Bill and I will be meeting next week to begin to map out a transition plan to transfer knowledge and skills as soon as possible to bring Bill up to speed while we still have Mallik's support, expertise and tutelage.

Please join me in thanking Mallik for his services both over the years and continuing through June and in supporting Bill on the new opportunity he's presented with.

Please forward this on to other parties who may have an interest.

Best regards,
Lee Shull

Business Applications Manager
Beiersdorf Inc.
lshull@bdfusa.com
(203) 854-8137

# EXHIBIT

# G

**From:** Gleason, Pete /BDF LGA
**Sent:** Friday, January 04, 2008 10:26 AM
**To:** Kraus, Debra /BDF LGA; Shull, Lee /BDF LGA
**Subject:** RE: Mallik's Contract and Our EDI Solutions
Hi Deb,
I apologize for the miscommunication. I had planned on talking to you live prior to the announcement. The entire applications team as well as business key users were consulted prior to this decision being made and all involved decided that this was the way to go. This decision was not made by any one individual, it was a total collaboration. There were specific concerns about communication skills as well as a tendency toward volatility. This in no way reflects on your technical abilities and your input will be greatly appreciated.

As in every situation, this presents an opportunity, specifically in regards to how this is handled going forward. I know you are a professional and will accept this as a challenge. The input of your peers and the business key users is invaluable information and should be viewed as constructive criticism and used as positive motivation.

We can talk more on Monday.

Thanks,

Pete


**From:** Kraus, Debra /BDF LGA
**Sent:** Friday, January 04, 2008 9:50 AM
**To:** Shull, Lee /BDF LGA; Gleason, Pete /BDF LGA
**Subject:** Mallik's Contract and Our EDI Solutions


Hello Lee / Pete,

I very disappointed with this email because this opportunity was verbally promised to me and I accepted the offer, how could this position be given to someone else.


Regards,
Deb Kraus


**From:** Shull, Lee /BDF LGA
**Sent:** Friday, January 04, 2008 9:12 AM
**To:** DaSilva, Fabio /BDF LGA; Dunn, Ino /BDF LGA; Farfan, Hugo /BDF LGA; Goli, Mallik /BDF LGA; Lanese, David /BDF LGA; Longyear, Bill /BDF LGA; Losty, Jennifer /BDF LGA; Osborne, Mary Beth /BDF CVG; Kraus, Debra /BDF LGA; Mucci, Eric /BSS LGA; Smith, Julie /BDF HPN; Savage, Diane /BDF LGA; Abate, Kristopher /BDF LGA
**Cc:** Gleason, Pete /BDF LGA; Dubucq, Jacques /BSS HAM; Holding, Iain /BDF HPN; Wohlert, Ralf Dr. /BSS HAM; Machata, Michael /BDF VIE; Wynne, Neil /BDF HPN
**Subject:** Mallik's Contract and Our EDI Solutions


All,

I wanted to make you aware of a decision that has been made in regards to Mallik's contract with us. We've extended it through June of this year at which time we will assume responsibility for EDI functionality ourselves. Mallik has provided a great service to us over the past few years and his expertise has helped us stabilize and expand our EDI capabilities. He has done a great job working with BSS to migrate our solutions to the Hamburg based Seeburger solution.

Because of this state of stability and maturity combined with the need to bring the EDI knowledge and experience in house, Bill will be the primary person responsible for EDI solutions. As with Mallik, Bill can not do this alone and will rely on others within the IT group for support in ensuring the EDI solution as a whole supports our business needs. Mallik, Bill and I will be meeting next week to begin to map out a transition plan to transfer knowledge and skills as soon as possible to bring Bill up to speed while we still have Mallik's support, expertise and tutelage.

Please join me in thanking Mallik for his services both over the years and continuing through June and in supporting Bill on the new opportunity he's presented with.

Please forward this on to other parties who may have an interest.

Best regards,
Lee Shull

Business Applications Manager
Beiersdorf Inc.
lshull@bdfusa.com
(203) 854-8137

# EXHIBIT H

# BDF●●●●
# Beiersdorf Inc

## HARASSMENT POLICY

Beiersdorf is proud of its professional and congenial work environment and will take all necessary steps to ensure that the work environment remains pleasant for all who work here.

It is our policy that no employee be subjected to or tolerate harassment in any form by another employee, outside vendor or customer. Actions, jokes or derogatory words or comments based on an individual's sex, race, ethnicity, age, religion, martial status, veteran status, national origin, disability, citizenship, sexual orientation or any other legally protected characteristic is illegal, will not be tolerated and can subject the harasser and the Company to liability.

Although all forms of harassment are prohibited, it is our policy to emphasize that sexual harassment is specifically prohibited. Sexual harassment is a form of employee harassment which is demeaning to another person and undermines the integrity of the employment relationship. The Company prohibits any employee from threatening or insinuating that another employee's submission to, or rejection of, sexual advances will in any way influence any decision regarding employment, wages, advancement, duties or any other term or condition of employment.

Sexual harassment also includes conduct that is offensive and unwelcome to the employee or which creates an intimidating or hostile work environment. Examples of conduct whether person-to-person, on the telephone, voicemail or email which could constitute sexual harassment include: repeated offensive and unwelcome sexual flirtations, advances, propositions or physical contact; continual or repeated verbal abuse of a sexual nature, sexually related comments, "kidding," "teasing" or "joking;" graphic comments about an individual's body, obscene gestures, sexually degrading words used to describe an individual; or the display in the workplace of sexually suggestive objects or pictures.

If an employee believes he or she has been subjected to sexual harassment or any other form of harassment or intimidation, the employee must report the act immediately to his or her Department Head or a Human Resources Manager. If you are unsure of to whom to raise an issue of harassment, or if you have not received a satisfactory response within 5 business days after reporting any incident of what you perceive to be harassment, please contact Beiersdorf's President, currently Iain Holding at 203-563-5900. Do not allow an inappropriate situation to continue by not reporting it, regardless of who is creating the situation. No employee is exempt from our policy. All complaints of harassment will be investigated promptly, thoroughly and as confidentially as possible.

Any employee who is found to have engaged in harassment of another employee will be subject to disciplinary action, up to and including termination. Additional corrective action will be taken as needed. An employee who brings such a complaint to the attention of the Company in good faith, or an employee who cooperates in the investigation of such complaint, will not be adversely affected as a result of reporting the harassment.

K. Holding

Iain Holding
President, Beiersdorf North America
January 4, 2007

# BDF●●●●
# Beiersdorf Inc

## AFFIRMATIVE ACTION AND EQUAL EMPLOYMENT POLICY STATEMENT

Beiersdorf, Inc. has been and will continue to be an equal opportunity employer. To assure full implementation of this equal employment policy, we will take steps to assure that:

a. Persons are recruited, hired, assigned and promoted without regard to race, religion, color, national origin, citizenship, sex, veteran's status, age, sexual orientation, or non-job-related disability of any kind.

b. All other personnel actions, such as compensation, benefits, transfers, layoffs and recall from lay offs, access to training, education, tuition assistance and social recreation programs are administered without regard to race, religion, color, veteran's status, national origin, citizenship, sex, sexual orientation, age or non-job related disability.

c. Employees and applicants shall not be subjected to harassment, intimidation, threats, coercion or discrimination because they have: (1) filed a complaint; (2) assisted or participated in an investigation, compliance review hearing or any other activity related to the administration of any federal, state or local law requiring equal employment opportunity; (3) opposed any act or practice made unlawful by any federal, state or local law requiring equal opportunity; or (4) exercised any other right protected by federal state or local law requiring equal opportunity.

I have appointed Christine Hoque to take on the responsibilities of EEO Coordinator. As EEO Coordinator, she will be responsible for the day to day implementation and monitoring of this Affirmative Action Plan. As part of that responsibility, she will periodically analyze the Company's personnel actions and their effects to insure compliance with our equal employment policy.

If you, as one of our employees or as an applicant for employment, have any questions about this policy or would like to review or be considered under our Affirmative Action Plan, please see Christine Hoque during regular business hours.

I have reviewed and fully endorse our Affirmative Action and Equal Employment Opportunity program. In closing, I ask the continued assistance and support of all of the Company's personnel to attain our objective of equal employment opportunity for all.

Iain Holding
President, Beiersdorf North America

January 4, 2007

# EXHIBIT

# I

**From:** Debra Lee Kraus [mailto:debralee.kraus@yahoo.com]
**Sent:** Wednesday, November 12, 2008 5:17 PM
**To:** Nenner, Amy /BDF HPN
**Cc:** Wilcox, Kim /BDF HPN; Williams, Kathy /BDF LGA; Holding, Iain /BDF HPN
**Subject:** Cobra

Please cancel my Cobra policy dated September 25th 2008 in which you received via US mail on or about September 29th 2008. I believe that BDF Inc could accommodate me by keeping me on the Beiersdorf group plans as I believe you have done for others.

Thank you,

Debra Lee Kraus

---

**From:** Debra Lee Kraus [mailto:debralee.kraus@yahoo.com]
**Sent:** Thursday, November 13, 2008 7:38 PM
**To:** Williams, Kathy /BDF LGA
**Cc:** Nenner, Amy /BDF HPN; Holding, Iain /BDF HPN; Wilcox, Kim /BDF HPN
**Subject:** RE: Cobra

Dear Kathy Williams,

As you know, my benefit information or election options are private with Beiersdorf. I have not given you permission to forward, discuss or 'bounce' my emails to Jackson Lewis LLP.

The COBRA election form was addressed to me (Debra Lee Kraus) from you (Kathy Williams - Beiersdorf Inc.). This is a Beiersdorf (HR) Human Resources issue, not a Jackson Lewis LLP issue.

Furthermore, I feel that bouncing and/or forwarding my HR-related emails to Jackson Lewis LLP is needless. In the future, do not involve Jackson Lewis LLP in my private business with Beiersdorf as I have not given you permission to do so.

Again, this is an HR issue, not a Jackson Lewis LLP issue.

Thank you,

Debra Lee Kraus

# EXHIBIT J

**From:** roey@tchibo.de (roey@tchibo.de)
**To:** debralee.kraus@yahoo.com;
**Date:** Thu, July 17, 2008 2:25:27 AM
**Cc:**
**Subject:** AW: Request for assistance

Dear Debra,

I have forwarded your case to the department Corporate Responsibility. This departmentd is responsible for the observation of social standards. I just had a talk to them, they insured me that they would deal with the case. The head of the department will get in touch with the head of the deparment Corporate Responsibility of Beiersdorf Germany. This two departments will handle your request.

Someone of this departments either Tchibo or Beiersdorf Germany will get in touch with you and will keep you informened. Unfortunatly I cannot say when this will be.

I hope this informations helps you.

Regards
Eyvelin Ross

**Von:** Debra Lee Kraus [mailto:debralee.kraus@yahoo.com]
**Gesendet:** Mittwoch, 16. Juli 2008 15:23
**An:** Ross, Eyvelin
**Betreff:** Request for assistance

Wednesday, July 16, 2008

Hello Miss Ross,

I tried to call you, but was unable to reach you. I spoke with two of your colleagues, one, Mr. Siefert, stated that you (Miss Ross) know the case and that I should call back tomorrow, which is today. The other colleague, I believe the ladies name was Geestala, took my message and my telephone number.

http://us.mg4.mail.yahoo.com/dc/launch?.gx=1&.rand=37u9ppqve5a7j

I know you stated that you needed two days to find the right person to handle my case.  Who is the person handling my case?

Please call me to let me know the status of my request for assistance.

I appreciate your help in this matter.

Regards,

Debra Lee Kraus

(203) 888-5500
debralee.kraus@yahoo.com

# EXHIBIT

# K

Debra Lee Kraus
PO Box 192
Greens Farms, CT 06838-0192

Friday, October 31, 2008

Commission on Human Rights and Opportunities (CHRO)
SOUTHWEST REGION OFFICE
350 Fairfield Avenue, 6th Floor
Bridgeport, CT 06604
PHONE: (203) 579-6246
FAX: (203) 579-6950
TDD: (203) 579-6246

Attention: Mr. Shawn Burns

> Re:   Debra Lee Kraus v. Beiersdorf Inc
> CHRO Case # 08200276, 0920001, 0920096
> EEOC Case # 16A-2008-00659C,
>              16A-2008-01366C,
>              16A-2008-01658C

Dear Mr. Burns,

I was informed of Beiersdorf's offer on **Wednesday, October 29, 2008.**

Beiersdorf's offer of $8,000.00 is <u>unacceptable</u>.

Any peripherals that Beiersdorf spoke to you about do not have any bearing on my complaints, nor should they be considered in Beiersdorf's offer.  It is the facts in my complaints that need to be considered.

It is apparent from their past history and their current offer that Beiersdorf is not serious about "settling" my complaints as they claim; either privately or through a CHRO officer.

I feel I have been misled in entering into this early conciliation effort by Beiersdorf.

Thank you,

Debra Lee Kraus

cc: Ms. Tanya Hughes
cc: Ms. Madeline R. Malave

# EXHIBIT

# L

# Norwalk Police Department

## CASE/INCIDENT REPORT

SUPPLEMENTARY

| CFS NO. | DAY | INCIDENT DATE | TIME | DATE OF RPT | TIME OF RPT | TYPE OF INCIDENT | INCIDENT CD | INVESTIGATING OFFICER | BADGE NO |
|---|---|---|---|---|---|---|---|---|---|
| 0800002758 | 4 | INCIDENT DATE 01/16/2008 Thru 01/16/2008 | 15:36 | 01/16/2008 | 16:17 | HARASSMENT | 145 | Patrol Officer Sheehan, Timothy P. | S025 |

| DIVISION | DIVISION NO. | REFERENCE DIVISION | REFERENCE DIVISION NO. | CASE X-REFERENCE | UNIT ID | TYPIST | DATE TYPED | TIME TYPED |
|---|---|---|---|---|---|---|---|---|
| | | | | | C2D | TSHEEHAN | 01/16/2008 | 16:17 |

| STREET NO. | STREET NAME AND TYPE | APARTMENT NO / LOCATION | INTERSECTING STREET NAME AND TYPE | STATUS | TOWN CD |
|---|---|---|---|---|---|
| 00360 | Mlk Dr Norwalk | | | | 103 |

STATUS CODE  C=COMPLAINANT  V=VICTIM  A=ARRESTEE  J=JUVENILE  H=OTHER  M=MISSING  W=WITNESS  O=OFFENDER  D=DRIVER  S=SUSPECT  P=POLICE OFFICER  T=TOT

| STATUS | NAME | SEX | RACE | D.O.B. | ADDRESS | TELEPHONE | OP | STATE & NO. |
|---|---|---|---|---|---|---|---|---|
| C | KRAUS, DEBRA L | F | W | | | ▓ : Cel | | CT |
| | | | W | | ▓ | ▓ : Hom | | |
| H | Gleason, Peter | M | | | | ▓ : Bus | | CT |

Complainant stated she made a complaint to her employer, Iain Holding, the president of BDF INC. after her manager Peter Gleason
sent a reply email to her accusing her of being volatile.

That she is intimidated by, and fears her manager, Peter Gleason, as he speaks to her inappropriately.

That she fears for her safety, since he had spoken in the past about how he has guns, and  also stated in the past how he has made
someone disappear.  That these conversation had occurred in 2005 after she complained and  the vice president ordered him to remove
her picture taken at the office from his cell phone. That the conversation was not reported to the police in 2005.

That she was recently denied a promotion by Mr. Gleason, and believes her job is threatened by his actions.

She filed a complaint with the BDF Human Resources Department.

That she wants him warned not to have inappropriate conversations with her, so she does not have to fear him.

A sworn written statement was taken from the complainant, and copies of two recent emails are included with this report.

A phone message was left for Mr. Gleason for follow up regarding the 2005 conversation.

She was referred to the Connecticut Commission on Human Rights and Opportunities(CHRO) as she complains of a hostile working
environment and inaction by her employer and the BDF Human Resources Department.

OFFICER SIGNATURE

SUPERVISOR SIGNATURE

SUBSCRIBED &SWORN BEFORE ME: NOTARY

THIS _____ DAY OF _____ YR. _____

# EXHIBIT

# M

**BDF ●●●●**
**Beiersdorf**

# PROMOTION ANNOUNCEMENT
### September 4, 2007

I am pleased to announce that Kris Abate has been promoted to the position of Supervisor, IT Operations effective September 1, 2007.

Kris joined Beiersdorf in July of 2004 as a PC Support Specialist for the Wilton office where he was responsible for local and remote support of PC hardware and associated applications.  Kris's exemplary work ethic and ability to perform under pressure quickly earned him the respect of the end user community as well as his fellow IT associates.   Kris played a key role in the project to upgrade the Telecommunications system and has been instrumental in the development and overall success of the Operations Support team.

In his new role, Kris' responsibilities will include supervision of first and second tier Technical Service Center analysts while providing third tier operational support for information technology systems and PC / MAC applications.  Kris will also be responsible for telecommunications systems, associated devices, applications, and networks for both land based and cellular services.

Diane Savage and Julie Smith will continue in their respective roles and will report directly to Kris.

Please join me in congratulating Kris on his well deserved promotion.

_____

Pete Gleason
Manager, IT Operations & Support

_____

Iain Holding
President, Beiersdorf North America

# EXHIBIT

# N

## ORGANIZATIONAL ANNOUNCEMENT
February 6, 2006

I am pleased to announce that Hugo Farfan has accepted the position of the Business Analyst responsible for SAP Materials Management and Production Planning.

As the Business Analyst for Materials Management and Production Planning (MM/PP), Hugo will be responsible for supporting our existing MM/PP processes as well as extending our use of MM/PP to new areas.

Hugo joined Beiersdorf in 2002 as a Manufacturing Supervisor and managed employees on 2nd and 3rd shift compounding, identified process improvements and helped implement SAP in that department. He performed in this role until 2004 when he took on increasing responsibility as a Master Scheduler managing the Production Planning Team and all aspects of production scheduling and material planning. In this role Hugo led, and/or contributed to various projects that have improved processes including more effective scheduling strategies, capacity planning, production scheduling, and materials planning.

Hugo is joining us as we have several important MM/PP projects on the horizon and we look forward to leveraging his existing business knowledge and familiarity with the people he will soon be working with to deliver quality solutions. Hugo will be transitioning from his current role over the weeks come. I am excited to have him as part of our IT team. Please join me in congratulating him on his new position.

_____

Lee Shull
Manager, Business Applications

_____
Jason Phillips
Vice President, Information Technology

# EXHIBIT

# O

**Wice, Alison J. (HFD)**

| | |
|---|---|
| **From:** | Williams, Kathy /BDF LGA [KWilliams@bdfusa.com] |
| **Sent:** | Wednesday, January 09, 2008 2:31 PM |
| **To:** | Soltis, Michael J. (ST) |
| **Subject:** | FW: Mallik's Contract and Our EDI Solutions |

For discussion.

*Kathy N. Williams*
Human Resources Manager
Phone: (203) 854-8123
Fax:  (203) 854-8112
E-mail:  kwilliams@bdfusa.com

---

**From:** Shull, Lee /BDF LGA
**Sent:** Wednesday, January 09, 2008 1:19 PM
**To:** Williams, Kathy /BDF LGA
**Subject:** RE: Mallik's Contract and Our EDI Solutions

Hi Kathy,

Per Pete's request, here's my account of the events that led up to and the conversation I had with Deb on Friday afternoon.

When I saw Deb's reply to my email outlining my EDI transition plan, I reached out to her to talk to first apologize for assuming Pete had discussed it with her prior and then to explain how the decision was reached. I'd stopped by her office mid-morning but she said she wasn't ready to talk so I let her know I had scheduled meetings but to let me know when she had time. Some folks from my group inquired about what was going on because they'd heard her slamming things near the printer and crying in her office. Late in the day Friday I saw her call while I was on the phone with World Park so I hung up and went to her office and caught her on her way out the door.

We had about a 15-20 minute discussion that was very professional. I started out apologizing for the way she found out to which she mentioned she was shocked and upset when seeing my email. I told her I was sorry it came as such a surprise and my intention was not to hurt anyone's feelings. I explained that I sent the email Friday because I was having a 2008 planning workshop with my group and wanted everyone to be aware of Mallik's contract ending in June. I'd discussed the contract with Mallik and added responsibility with Bill prior to the holidays. I also explained why I decided to keep the responsibility within my group versus to Deb as another potential option that was being explored. I mentioned that I'd had concerns about my ability to deal with people in a professional and polite manner within the IT department (as I've witnessed some very short and terse email responses to people in my group).

I didn't go into the following detail on this point with her but my concern was supported by the fact that when I asked my group behind closed doors what they thought of Deb possibly assuming the responsibility, I received lukewarm response but not much dialogue. I then talked with people within my group individually and each said they didn't think it was the best idea because of the relationships they'd had with her over the years or months. One person in the group says they don't have the same issues the others in the department have. She tends to hold onto information and not share it with others, she can be abrasive and short with people when dealing with what should be normal conversations, and intimidates people to the point that they will sometimes not contact her via phone or in person to clarify a situation that got out of hand in an email.

I told her that my concern was that if she had issues communicating with people within our own group, that I didn't feel comfortable handing over primary responsibility for our EDI functionality where she would have to interact with sales people and customer's. A majority of our business is conducted via EDI and it was too big a risk to take at this point in my opinion, hence I was designating Bill as the primary person responsible. She then talked about how she wanted to advance, gain new skills, make more money, be an SAP Support Manager and that she felt she's been a professional throughout her career here. I told her that I could appreciate those things and told her that the responsibility being placed with Bill came with no additional money or title change. I stressed that she still has an opportunity to contribute in that Bill

will need help and although he was the primary person responsible that it would still be a team effort, more than ever with Mallik's expertise gone and we'd still look to her for her technical skills as well as Eric Mucci's. She said something to the effect of I'm not a robot and I don't appreciate having my feelings toyed with and that she wanted to advance like everyone else. She asked if we were trying to push her out the door and diminish her role here, that she felt this was some sort of ploy, and that she was expecting Brian Lusignan to show up at her office with a camera and escort her form the building that day. I told her absolutely not, that we valued the work she does for us and we feel she keeps things running smooth from a technical standpoint. At one point, she said she could do anything in the company if given the chance. She mentioned that this was the 4th time she was promised something only to have it taken away from her. I told her that since I was not her manager, I had neither such authority nor any knowledge of any promise to her in this case or any other prior to this subject and it was something she'd have to address with Pete.

I reiterated that she should not look at this in such a negative way, to use this as an opportunity to take constructive feedback and do something with it. I talked about how people have perceptions of us that we may not agree with but those are their perceptions and it's up to us to step back and reflect why people may have a certain view of us so that we might make changes in our behavior. We thanked each other for the time and the opportunity to clear things up and I again apologized for how she became aware of the EDI responsibility.

Please let me know if you have any questions.

Best regards,
Lee Shull

Business Applications Manager
Beiersdorf Inc.
lshull@bdfusa.com
(203) 854-8137

---

**From:** Shull, Lee /BDF LGA
**Sent:** Friday, January 04, 2008 9:57 AM
**To:** Kraus, Debra /BDF LGA; Gleason, Pete /BDF LGA
**Subject:** RE: Mallik's Contract and Our EDI Solutions

Hi Deb,

Please accept my apologies; this was a decision that was made after initially speaking with Pete about you being the primary person. After some thought I changed my position and I'd discussed this with Pete. I should have made sure he discussed it with you before I sent this email out. I have a meeting at 10 but can stop by afterwards to talk more about this.

Best regards,
Lee Shull

Business Applications Manager
Beiersdorf Inc.
lshull@bdfusa.com
(203) 854-8137

---

**From:** Kraus, Debra /BDF LGA
**Sent:** Friday, January 04, 2008 9:50 AM
**To:** Shull, Lee /BDF LGA; Gleason, Pete /BDF LGA
**Subject:** Mallik's Contract and Our EDI Solutions

Hello Lee / Pete,

I very disappointed with this email because this opportunity was verbally promised to me and I accepted the offer, how could this position be given to someone else.

Regards,
Deb Kraus

---

**From:** Shull, Lee /BDF LGA
**Sent:** Friday, January 04, 2008 9:12 AM
**To:** DaSilva, Fabio /BDF LGA; Dunn, Ino /BDF LGA; Farfan, Hugo /BDF LGA; Goli, Mallik /BDF LGA; Lanese, David /BDF LGA; Longyear, Bill /BDF LGA; Losty, Jennifer /BDF LGA; Osborne, Mary Beth /BDF CVG; Kraus, Debra /BDF LGA; Mucci, Eric /BSS LGA; Smith, Julie /BDF HPN; Savage, Diane /BDF LGA; Abate, Kristopher /BDF LGA
**Cc:** Gleason, Pete /BDF LGA; Dubucq, Jacques /BSS HAM; Holding, Iain /BDF HPN; Wohlert, Ralf Dr. /BSS HAM; Machata, Michael /BDF VIE; Wynne, Neil /BDF HPN
**Subject:** Mallik's Contract and Our EDI Solutions

All,

I wanted to make you aware of a decision that has been made in regards to Mallik's contract with us. We've extended it through June of this year at which time we will assume responsibility for EDI functionality ourselves. Mallik has provided a great service to us over the past few years and his expertise has helped us stabilize and expand our EDI capabilities. He has done a great job working with BSS to migrate our solutions to the Hamburg based Seeburger solution.

Because of this state of stability and maturity combined with the need to bring the EDI knowledge and experience in house, Bill will be the primary person responsible for EDI solutions. As with Mallik, Bill can not do this alone and will rely on others within the IT group for support in ensuring the EDI solution as a whole supports our business needs. Mallik, Bill and I will be meeting next week to begin to map out a transition plan to transfer knowledge and skills as soon as possible to bring Bill up to speed while we still have Mallik's support, expertise and tutelage.

Please join me in thanking Mallik for his services both over the years and continuing through June and in supporting Bill on the new opportunity he's presented with.

Please forward this on to other parties who may have an interest.

Best regards,
Lee Shull

Business Applications Manager
Beiersdorf Inc.
lshull@bdfusa.com
(203) 854-8137

---

This electronic transmission is strictly confidential and intended

# EXHIBIT

# P

**From:** Gleason, Pete /BDF LGA
**Sent:** Wednesday, January 09, 2008 12:44 PM
**To:** Williams, Kathy /BDF LGA
**Subject:** RE: Mallik's Contract and Our EDI Solutions

Hello,

The following is an account of my conversation with Deb Kraus following my meeting with Lisa Hiott on Monday the 7th of January 2008.

After leaving Lisa's office I returned to my office and called Deb at which time I told her that I needed to talk to her and that I would like to stop down to her office. She said "no problem, I am here."

I went to Debs office and she was in the middle of a discussion with Bill Longyear regarding a technical issue regarding a process for AAS reclassification. I waited for the discussion to end and closed the door after Bill had left.

I then told Deb that we need to discuss the events of the previous Friday and her reaction to the news that Bill Longyear and Lee Shull would be assuming the responsibility for the EDI process.

I asked Deb if she was under the impression that the EDI responsibilities actually represented a position or job, to which she replied, yes. I then asked her where she got that impression from and that the responsibilities were just that and that there was no position. Deb replied that her impression was that there was a position. I then asked her about her comment that the "job" was verbally promised to her. She told me that both Lee and I had promised her the job. I responded that I hadn't promised her anything and that there was not actually a position and that the responsibility for the EDI process belonged to Lee as the Manger of IT Applications.

I told Deb that the decision regarding the EDI responsibilities had nothing to do with her technical abilities and that there were concerns regarding her interpersonal skills and tendency toward volatility. (as I detailed in my e-mail). she initially took exception to these statements and got a bit agitated. I also reiterated that this was a perfect opportunity to take the comments made by her co-workers and act on them in a positive manner. Deb then told me that Iain Holding would be getting back to her regarding the situation, ( her tone at this point was dismissive and she said it in a way that I interpreted as 'it doesn't matter what you think, Iain is going to take care of the matter') I then very nicely explained to Deb that Iain had an enormous amount of responsibility and that there was no way that he would have the bandwidth to get involved with issues such as this. I went into details regarding the structure of the organization.

At this point the conversation switched back to Deb's tendency toward volatility and that her actions of last Friday were a good example. Deb initially disagreed strongly but as I talked through it again she reluctantly agreed. I mentioned that there were training classes offered by the company to assist with interpersonal skills and I also mentioned that there was a toll free number that I had recently used to deal with some personal issues and how it was a great help to me. Deb did not seem interested in pursuing either option.

Deb then seemed to be concerned that she had done damage to her reputation and wanted to know if she had done herself any harm to which I replied, "no, you were very passionate about an opportunity and that I would communicate it as such. Deb then informed me that she was so distraught on Friday that she had actually called Diane

Savage to commiserate about the situation. I responded "Oh Deb, why did you do that? You are so much better than that"

I then asked Deb "what is the real issue here" to which she replied that she wanted to make more money and saw this as an opportunity. I reiterated that the EDI responsibility would be an additional responsibility and that there would be no additional money associated with it. Deb then started talking about how other people are getting ahead and that it's not fair that she hasn't been recognized and promoted to a mangers position. I then explained to Deb that our company was in a transition mode and that the Hay Study had not been completed yet and that hopefully there would be some positive news but that I could not promise anything. I also explained that many individuals were taking on additional responsibilities, ( I named John Schosser and Mike Vitti as two examples)and that to the best of my knowledge there have been no promotions. I then said "look at Lee and myself, we have taken on the responsibility of Jason Phillip's former position and that we are both still managers at a grade level below other individuals in my position." Deb then responded "Pete, you make $120.000.00 a year and you have had five job title changes since you have been here." I responded that that was not true information and asked her where she had heard it from. Deb said that it doesn't matter where she heard it from and continued talking about how she wanted to be recognized for what she has accomplished and how professional she is and that she deserved to be promoted. I again said "Deb, I need to know where you got your information from" to which she replied, "a number of different people'. I told her how serious a breach in our network security was and that I really needed to know where she got the information from.  At this point Deb began double talking so I asked her if she had received the information form Diane Savage during their conversation. Deb paused for a long period and said ummm, I'd rather not say.
I then returned to my office and called you.

I will be on my cell phone for the remainder of the day.
Thanks,
        Pete


Pete Gleason
Manager of IT Operations & Support
Beiersdorf NA.
203-854-8091


 Before printing, think about the environment